**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 1:20-CR-00696 |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| ANTHONY SIMPKINS-MCDONALD | ) | |

**MEMORANDUM OPINION AND ORDER**

In August 2020, Chicago police officers found a gun and ammunition magazine hidden in Anthony Simpkins-McDonald's car during what had been a routine traffic stop. R. 37, Def's. Mot. at 4.[1] Simpkins-McDonald now moves to suppress evidence of the gun and magazine, and the statements he made during the traffic stop. He believes that (1) the officers' search of his car violated his Fourth Amendment rights; and (2) the traffic stop transformed into a custodial interrogation but the officers failed to give Simpkins-McDonald any *Miranda* warnings. *Id.* at 5, 10. Not surprisingly, the government opposes the motion. R. 41, Resp. For the reasons explained in this Opinion, Simpkins-McDonald's motion is granted in part and denied in part.

## I. Background

Shortly before 10 p.m. on August 14, 2020, Simpkins-McDonald was driving a black Subaru on a street in Niles. Def.'s Mot. at 1. The problem: no working taillights. *Id.*: Resp. at 2. Niles Police Officers Carlos Jimenez and Roy Brines spotted

[1]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number. The video exhibits are not on the docket.

Simpkins-McDonald driving down the street. Def's. Mot. at 1; Resp. at 2; Exh. D, Jimenez Dash Cam, 21:49:45–21:51:00. After following Simpkins-McDonald for a few blocks, Jimenez turned on his emergency lights. *Id.* at 2. At first, Simpkins-McDonald reacted by stopping his car in the left lane and putting his head and arms out the driver's side window. Resp. at 2–3; Jimenez Dash Cam, 21:51:00–21:51:40. Then he pulled over to the right curb lane, and again put his head and arms out of the window. Resp. at 3; Jimenez Dash Cam at 21:52:12–30. Jimenez and Brines also pulled over to the curb and approached Simpkins-McDonald's car. Resp. at 3. Jimenez spoke to Simpkins-McDonald through the driver's side window for several minutes. Jimenez Dash Cam at 21:53:30–22:00:00. He could smell cannabis and saw that Simpkins-McDonald had "red bloodshot glassy eyes and an undone zipper and belt." Exh. C, Police Report, 28. He could also see cannabis leaves in the driver's lap and strewn over the front seat area. Resp. at 3; Exh. A, Jimenez Body Cam, 22:20:08. And he could see an open container of cannabis on the front passenger seat. Resp. at 3; Police Report at 28. The government also alleges that Simpkins-McDonald made "furtive movements" toward the passenger side of the car. Resp. at 4; Police Report at 28.

Jimenez ordered Simpkins-McDonald to get out of the car for a field sobriety test. Mot. at 2; Exh. B, Brines Body Cam, 22:00:28–1:31. Simpkins-McDonald got out, and also fastened his pants and belt while talking with Jimenez. *Id*. at 22:00:28–55. Jimenez patted Simpkins-McDonald down and did not find any weapons or contraband. Mot. at 2; Brines Body Cam at 22:01:30–22:02:04. Jimenez then explained, "I

gotta verify that you're good to drive." Jimenez Body Cam at 22:03:20.[2] Then he conducted the field sobriety test, which lasted around 10 minutes. Def's. Mot. at 2; Jimenez Body Cam at 22:03:30–22:12:50. Simpkins-McDonald told Jimenez that he had last smoked about two hours earlier; he then followed all the instructions to perform the test. *Id.*

After finishing the test, Jimenez asked Simpkins-McDonald if he had "anybody nearby" who could come and get the car, explaining that Simpkins-McDonald would not be allowed to drive or park it because he was "still a little high." Jimenez Body Cam at 22:12:50–22:14:00. In his report, Jimenez described Simpkins-McDonald as showing "minimal signs of impairment." Police Report at 28. Jimenez further told Simpkins-McDonald, "Because you're being cool with me and everything else, that's why I'm not going to arrest you for the DUI and I'm not going to take your car." Jimenez Body Cam at 22:13:35–55. He explained that the open container was also a misdemeanor, but that he would use his discretion to write Simpkins-McDonald a ticket. *Id.* at 22:14:00–30. Simpkins-McDonald asked if he was going to be arrested, and Jimenez responded, "No." *Id.* at 22:14:30–50. Then Jimenez explained that he would need to "take the weed" and then he would write Simpkins-McDonald two tickets. *Id.* at 22:15:00–30. When Simpkins-McDonald asked, "Who cares about the weed?" and explained that he had a medical marijuana card, Jimenez again explained

[2]Exhibit A, Jimenez's body camera footage, begins during this pat-down. Jimenez Body Cam 22:01:56.

that he could not smoke in the car and that he could have arrested him, saying, "take this as a blessing." *Id.* at 22:15:20–45.

Simpkins-McDonald began moving towards the car, saying "let's go get the weed." Jimenez Body Cam at 22:15:40–43. Jimenez told him that he (Jimenez) would grab it, and told Simpkins-McDonald to sit down. *Id.* at 22:15:45. Jimenez followed this up by saying, "You don't gotta sit down if you don't want to, but it's gonna take a little bit." *Id.* at 22:15:45–22:15:50. When Simpkins-McDonald said he wanted to get his cigarettes out of the car, Jimenez told him that he would get the cigarettes, wallet, and "all your stuff." *Id.* at 22:15:50–58. Jimenez and Brines explained that, after searching the car, they would park it around the corner in a nearby lot. *Id.* at 22:16:00–20. Then the officers again told Simpkins-McDonald to "hang tight" (Jimenez) and "take a seat" (Brines). *Id.* at 22:16:20–27. Simpkins-McDonald sat on the curb, and Jimenez walked over to begin searching the car. *Id.* at 22:16:30–38. Simpkins-McDonald then asked, as he sat on the curb, if he had to sit, and Brines answered, "Yeah, take a seat." Brines Body Cam at 22:16:55–58.

From his seat on the curb, Simpkins-McDonald objected to Jimenez searching the car, and then stood up and began walking over to the car, ignoring Brines's repeated instruction to "take a seat," and Brines's question, "What else you got in the car?" Brines Body Cam at 22:17:08–25. Brines called to Jimenez, who came back around to speak with Simpkins-McDonald. *Id.* at 22:17:24–55. Simpkins-McDonald again objected to the search, and Jimenez again explained that he had to take the cannabis and search the car for any other contraband. *Id.* at 22:17:25–30. He also

asked Simpkins-McDonald what else was in the car. *Id.* at 22:17:30–34. As Simpkins-McDonald continued to object, Jimenez explained that he needed to search the car and remove any contraband as "part of the deal" of Simpkins-McDonald only receiving tickets, and that the other option was to arrest him and conduct the same search. *Id.* at 22:17:35–22:18:05. Jimenez again said, "Take the blessing here," then immediately asked, again, "What is in the car?" *Id.* at 22:18:05–12. As Brines told him to sit down, Jimenez asked again what was in the car, and Simpkins-McDonald said it was "just the weed." *Id.* at 22:18:12–26. Jimenez explained again that he would "grab the weed," search the car to make sure he had all of it, give Simpkins-McDonald tickets, and then park the car nearby. *Id.* at 22:18:26–35. Jimenez also reiterated that Simpkins-McDonald could call someone to come pick up the car after the search. *Id.* at 22:18:36–42.

Simpkins-McDonald asked if he could call his wife, and asked, "Can she come get me?" Brines Body Cam at 22:18:55–19:03. Jimenez answered both questions yes, but told Simpkins-McDonald repeatedly to sit down while he made the call. Brines Body Cam at 22:18:55–20. Jimenez also asked how far away Simpkins-McDonald's wife was, and upon hearing she was not far, reiterated that she could come get Simpkins-McDonald and the car once the search was complete. *Id.* Brines also instructed Simpkins-McDonald to sit. *Id.* at 22:19:20. Simpkins-McDonald complied and sat back down on the curb as he called his wife. *Id.* at 22:19:19–21. Then Jimenez told him to cross his ankles. *Id.* 22:19:21–24. Jimenez resumed searching the car, and Brines remained behind to supervise Simpkins-McDonald, who had reached his wife

on the phone. *Id.* at 22:19:30–35. While speaking with his wife, Simpkins-McDonald asked for the address of the traffic stop, which Brines gave him and which he relayed to his wife. *Id.* at 22:19:40–22:20:00. Then he asked Brines what police station he would be taken to if he were to be "locked up." *Id.* at 22:20:00–05. To this, Brines responded, "You're not going to jail! What do you have in the car?" *Id.* at 22:20:05–07. Simpkins-McDonald asked again about the police station and its address, and Brines told him it would be the Niles Police Station at 7000 Touhy Avenue. *Id.* at 22:20:10–20. Simpkins-McDonald then gave the address to his wife on the phone, and Brines asked again what was in the car. 22:20:20–45. Simpkins-McDonald did not answer, instead telling his wife to come to the station address. *Id.*

At this point, Brines told Jimenez, "Carlos, let's detain him." Brines Body Cam at 22:20:48–50. Jimenez and Brines told Simpkins-McDonald to stand, put him in handcuffs, and told him, "You're being detained right now." *Id.* at 22:20:51–22:21:19. The officers did not advise Simpkins-McDonald of his *Miranda* rights. Simpkins-McDonald, still on the phone with his wife, told her to "come to the location—7000 Touhy Avenue." *Id.* at 22:21:00–04. She asked him why she had to come there, and hearing that he was being detained, asked for what, to which Simpkins-McDonald explained that he had been pulled over in a traffic stop. *Id.* at 22:21:05–28. The officers sat him back down on the curb during this conversation. *Id.* Jimenez, having missed most of the previous few minutes of interaction because he was searching the car, told Simpkins-McDonald to give his wife the address "so she can come get the car." *Id.* 22:21:29–33. When he heard Simpkins-McDonald give the police station

address, he stopped and turned and reminded Simpkins-McDonald he was not at the station. *Id.* at 22:21:35–47. Meanwhile, Brines hung up Simpkins-McDonald's cell phone, which he had taken while handcuffing him, and said, "We'll call your baby mama back when we're done." *Id.* at 22:21:36:48–50. Then Jimenez went back to resume searching the car, and Brines again asked Simpkins-McDonald what was in the car. *Id.* at 22:21:50–22:00:00. Simpkins-McDonald again said, "nothing but weed" and Brines asked how much, and asked, "Why are you talking about going to jail?" *Id.* at 22:22:00–08. Simpkins-McDonald answered, "Because you all like put me in handcuffs, doing all this extra, and I ain't did nothing, bro." *Id.* at 22:22:10–19.

Two more uniformed officers now arrived and one immediately agreed to help Jimenez search the car. Brines Body Cam at 22:22:15–30. As the new officer walked away, Simpkins-McDonald again asked why the car was being searched, and Brines said, "There's weed in plain view which gives us probable cause to search the car." *Id.* at 22:22:35–40. Then he asked once again what else was in the car, imploring Simpkins-McDonald to "be honest with me, bro." *Id.* at 22:22:40–46. Simpkins-McDonald then began to explain that he had been spending time with friends earlier that day, and one of them said he would give him a gun. *Id.* at 22:22:47–23:05. Brines asked where the gun was, and Simpkins-McDonald said, "He's gonna find it … just let him find it." *Id.* at 22:23:05–14. Simpkins-McDonald further stated that the gun wasn't his and he didn't know where it was in the car, at which point Brines walked over to the car to ask the searching officers if they had found the gun. *Id.* at 22:23:15–35. A few moments later, Brines confirmed the officers had found the gun in the car.

22:24:00–05. They had also found a magazine shortly before finding the gun. Jimenez Body Cam, 22:23:20. In the background of Brines's body-cam footage, Simpkins-McDonald can be heard continuing to answer questions about the gun. Brines Body Cam at 22:23:30–22:25:54. He said several times that he thought the friend who had said he would give him a gun might have been "just talking." *Id.*

A few minutes after finding the gun, and after learning from another newly arrived officer that he had been convicted of robbery, officers arrested Simpkins-McDonald. *Id.* at 22:27:00–30. He asked why he was being arrested, and Jimenez told him he already knew. *Id.* at 22:27:45–22:27:55. The officers explained what would happen next, and seated him in the car. *Id.* at 22:27:56–29:25. Shortly thereafter, Brines read him his *Miranda* rights from a card. *Id.* at 22:30:32–31:05. Brines asked Simpkins-McDonald if he understood his rights, and Simpkins-McDonalds answered, "Yes, sir." *Id.* at 22:31:05–08. Brines also asked if he had a concealed-carry license or a FOID (Firearm Owners Identification) card, to which he answered that he did not. 22:31:40–44. Officers asked him several more questions about the gun, which he answered while sitting in the squad car. *Id.* 22:31:45–33:26. Simpkins-McDonald made additional statements on the way to the station and at the station. *Id.* 22:44:00–47:15; Resp. at 10; Police Report at 29.

A grand jury charged Simpkins-McDonald with unlawfully possessing a firearm after being convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). R. 17, Indictment.

## II. Legal Standard

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. CONST. amend. IV. This "protection extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). Thus, even when a police officer pulls over a vehicle for a brief traffic stop, the "officer must have at least an articulable and reasonable suspicion that the particular person stopped is breaking the law." *United States v. Rodriguez-Escalera*, 884 F.3d 661, 667–68 (7th Cir. 2018) (quoting *Delaware v. Prouse*, 440 U.S. 648, 663 (1979)) (cleaned up).[3] Reasonable suspicion must amount to more than a hunch, but need not rise to the more demanding standard of probable cause. *Gentry v. Sevier*, 597 F.3d 838, 845 (7th Cir. 2010). "When determining whether an officer had reasonable suspicion, courts examine the totality of the circumstances known to the officer at the time of the stop, including the experience of the officer and the behavior and characteristics of the suspect." *United States v. Mays*, 819 F.3d 951, 955 (7th Cir. 2015) (cleaned up).

The Fourth Amendment also protects against warrantless searches, "unless one of a few specifically established and well-delineated exceptions applies." *United States v. Williams*, 627 F.3d 247, 251 (7th Cir. 2010) (citing *Arizona v. Gant*, 556 U.S. 332 (2009)). One exception to the warrant requirement is the automobile exception,

[3]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

which authorizes an officer to conduct a warrantless search of a car if there is probable cause to believe it contains contraband or evidence of a crime. *Id.* When probable cause exists to search a car, officers can search any part of the car that might contain contraband, "including closed compartments, containers, packages, and trunks." *Id.*

If a search or seizure violates the Fourth Amendment, a court will generally exclude the evidence arising from the search and seizure. *United States v. Wilbourn*, 799 F.3d 900, 910 (7th Cir. 2015); *see also Wong Sun v. United States*, 371 U.S. 471, 484–86 (1963).

## III. Analysis

Simpkins-McDonald argues that the gun found in his car must be suppressed because the police officers had no right to prolong his detention and search his car. Def's Mot. at 5–7. He further argues that the statements he made while detained at the scene of the traffic stops must be suppressed on two grounds: (1) as "fruit of the poisonous tree" from the unlawfully prolonged stop; and (2) he was not read his *Miranda* rights. *Id*. at 5, 10.

As an initial matter, there is no need to hold an evidentiary hearing. The parties and the Court have the benefit of several video recordings of the interactions at issue. The defense has not submitted an affidavit or any other facts or evidence to contradict the videos, or otherwise demonstrate that a hearing is warranted. The defense claims only there are discrepancies between the videos provided, and the police report authored by Jimenez. Def's. Mot. at 4–5. But the claimed discrepancies are minor and irrelevant. The report states that Simpkins-McDonald attempted to

"block" Jimenez from returning to the car. Police Report at 28. Having viewed Brines's and Jimenez's body camera footage, the Court agrees with the defense that "block" is an overstatement, but the footage does clearly show Simpkins-McDonald objecting to the search of his car, and trying—though not at all violently—to stop Jimenez from searching it. Brines Body Cam at 22:17:08–25. The defense also clarifies that Simpkins-McDonald called his wife and told her to pick him up from the Niles Police Department *if he got arrested,* a qualifier that is absent from the police report. Def's Mot. at 5; Police Report. But this difference is both immaterial and overstated—Simpkins-McDonald told his wife in no uncertain terms to come to the station as he was being handcuffed. Brines Body Cam at 22:21:00–04. It also does not matter that Jimenez's report does not mention his initial statements about only issuing Simpkins-McDonald a ticket; the Court has heard those statements on the videos. Def's. Mot. at 5; Police Report; Jimenez Body Cam 22:13:35–55, 22:14:00–50; Brines Body Cam 22:17:35–18:05, 22:20:05–07. In general, to the extent that the videos conflict with the police report, the Court naturally will credit the video footage.

**A. The Gun**

The defense has moved to suppress the firearm recovered from Simpkins-McDonald's car on the grounds that the officers unlawfully prolonged his detention in order to search the car, in violation of his Fourth Amendment rights. Def's. Mot. at 5. The government argues that Simpkins-McDonald was subject to a lawful traffic stop based on probable cause, during which the officers acquired probable cause to believe he had also committed cannabis violations, which made his detention

reasonable. Resp. at 12–15. Moreover, the government argues that the automobile exception to the warrant requirement permitted the search. *Id.* at 15.

To begin, the initial seizure of Simpkins-McDonald's Subaru was a valid traffic stop. *Brendlin v. California*, 551 U.S. 249, 257–58 (2007). The dash-cam footage clearly shows him driving without tail-lights and being pulled over. Jimenez Dash Cam, 21:49:45–21:51:00. Moreover, Simpkins-McDonald's brief does not challenge the initial stop and he has presented no evidence undermining the video or calling the fact into question. Based on the uncontradicted camera footage, the traffic stop itself was valid.

Moving on based on that starting point, "[d]uring a valid traffic stop, an officer may order the driver and passengers out of the vehicle without violating the Fourth Amendment." *United States v. Tinnie*, 629 F.3d 749, 751 (7th Cir. 2011). If an officer has a reasonable suspicion that the driver or passenger may be armed and dangerous, then the officer may also frisk that individual. *Id.* To determine if a suspicion was reasonable, the question "is whether a reasonably prudent [officer] in the circumstances would be warranted in the belief that [the officer's] safety or that of others was in danger." *Terry*, 392 U.S. at 27.

Simpkins-McDonald acknowledges that he was "stopped initially for driving without taillights," and that the police officers "observed a container of cannabis in plain view." Def's. Mot. at 7. He concedes: "This observation granted reasonable suspicion enough to investigate the cannabis further." *Id.* So the defense concedes that the officers did not violate Simpkins-McDonald's rights when they ordered him to get

out of the car, patted him down, and conducted the field sobriety test. *Id.* The defense argues, however, that the officers unlawfully prolonged his detention when they conducted a warrantless search of the car after deciding that he would simply be ticketed for the open container of cannabis. *Id.* The defense argues that the officers "needed independent probable cause after resolving the cannabis violation in order to legally search Mr. Simpkins-McDonald's car," and that they lacked this probable cause. *Id.* at 5.

As the government points out, however, the automobile exception to the Fourth Amendment's warrant requirement applies in full force to the facts here, making the search reasonable. Resp. at 15. In the words of the Seventh Circuit, "the automobile exception permits the police to search a vehicle if there is probable cause to believe it contains evidence of criminal activity. … The authority to search encompasses any area of the vehicle where evidence of the crime might be found." *United States v. Charles*, 801 F.3d 855, 860 (7th Cir. 2015) (citing *Gant*, 556 U.S. at 347). In this case, Jimenez and Brines had seen an open container of cannabis, as well as cannabis leaves scattered around the front seats of the vehicle. Jimenez Body Cam, 22:20:08; Police Report at 28. Although the recreational use of marijuana is now legal in Illinois, it is still illegal to have an open container of cannabis in a car, 625 ILCS 5/11-502.15, and to drive under the influence of cannabis, 625 ILCS 5/11/-501. The officers thus had seen evidence of a crime and had probable cause to believe that there could be more proof in the car; at the very least, there was probable cause to believe that more marijuana would be found in the car. This gave them the authority to search

the car. *United States v. McGuire*, 957 F.2d 310 (7th Cir. 1992) (holding that when an officer found an open container of alcohol in the vehicle, he had "probable cause to believe that the car contained additional contraband or evidence," and thus had "authority to search every part of the vehicle and its contents that could conceal additional contraband, including the area beneath the passenger seat and the trunk"); *see also United States v. Foreste*, 780 F.3d 518, 527 (2nd Cir. 2015) (explaining that officers acted reasonably when they saw what looked like drug residue on motorist's clothing and nostrils, and detained motorist half an hour until a thorough drug search could be conducted); *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020) ("It is uncontested that Lott's admission to having marijuana in his car provided reasonable suspicion to the officers to prolong the stop."). The gun (and the magazine) that the officers found during this lawful search will not be suppressed.

The cases that Simpkins-McDonald cites in support of his argument that the officers unlawfully prolonged the traffic stop do not help him. In *Rodriguez v. United States*, the Supreme Court affirmed that an officer may not prolong a traffic stop beyond completing its original purpose, "absent reasonable suspicion." 575 U.S. 348, 353, 357 (2015). The Seventh Circuit applied this rule in a case where an Illinois State Trooper pulled over a couple for a traffic violation on the interstate and, after speaking with each of them briefly, became suspicious. *Rodriguez-Escalera*, 884 F.3d at 663–64. The driver and passenger were coming from Los Angeles, and each of them told the officer a different destination city—but the driver explained this by telling the officer that she had told her fiancée they were driving to Pennsylvania, while

planning to surprise him with a trip to New York City. *Id.* The officer felt that was strange and called for a canine unit to sniff the car. *Id.* at 664–65. He delayed issuing the tickets about half an hour, until the canine unit arrived. *Id.* at 665. The dog found no drugs, but the officer still had a hunch, so he asked for permission to search the car and found 7½ pounds of methamphetamine and $28,000 in cash *Id.* at 665–66. At an evidentiary hearing, he explained that he was suspicious because of the discrepancies in the driver and passenger's travel plans; their origin city of Los Angeles, "a major distribution center for narcotics trafficking"; the multiple air fresheners in the car; and the driver's nervousness. *Id.* at 666. But the district court concluded, and the Seventh Circuit agreed, that this was not enough to generate "the reasonable suspicion necessary to extend the stop" until the dog arrived. *Id.* As the Seventh Circuit explained: "Although reasonable suspicion embodies something less than probable cause, it requires more than a hunch or inchoate suspicion." *Id.* at 668 (citing *United States v. Wilbourn*, 799 F.3d 900, 909 (7th Cir. 2015)) (cleaned up).

Here, Officers Jimenez and Brines acted on much more than a mere hunch. They saw marijuana strewn across Simpkins-McDonald's front seat. Police Report at 28. They saw an open container of marijuana. *Id.* They subjected Simpkins-McDonald to a field sobriety test, which revealed he was impaired. *Id.* They had not just reasonable suspicion, but probable cause to believe that Simpkins-McDonald had committed infractions beyond driving without working tail-lights (the original reason for pulling him over). This is not a case like *Rodriguez-Escalera*, where an officer stopped a driver for a traffic infraction and had no good reason to detain her further. In this case, the

officers stopped Simpkins-McDonald for a traffic infraction and then were immediately confronted with clear evidence that additional offenses had been committed. The officers acted reasonably in prolonging the stop and searching the car.

Simpkins-McDonald argues that as soon as the officers told him they would give him tickets rather than arrest him, "the encounter ended." Def's. Mot. at 9. He argues that the officers "resolved the issue" of the cannabis container by patting him down, conducting the field sobriety test, and deciding to cite him. *Id.* at 9–10. But he cites no case law to support the idea that a drug offense like that must be deemed resolved in this way. As already explained, the automobile exception authorized the officers to search the car, regardless of whether they planned to arrest Simpkins-McDonald or merely issue a ticket. The officers' initial decision to ticket him was, as Jimenez explained at the time, a matter of discretion, and did not preclude the officers from searching the vehicle for more evidence. The search was lawful, and the gun and magazine found in that search is admissible.

**B. The Statements**

Simpkins-McDonald asks to suppress "the statements leading to the firearm"—specifically, everything he said after being told to sit down while Jimenez searched his car—because he was not provided *Miranda* warnings. Def's. Mot. at 9–10.[4] The government argues that Simpkins-McDonald was not in custody for *Miranda*

[4]The defense also asserts that the statements must be suppressed as "fruit of the poisonous tree" because the stop was unlawfully prolonged. Def's. Mot. at 5–6. As already explained, the stop and search were lawful, so this argument fails.

purposes until he was handcuffed. Resp. at 17. And even the statements Simpkins-McDonald made while in custody should still come in, according to the government, because (1) he was not interrogated, so the *Miranda* exclusionary rule does not apply; and (2) even if he was interrogated, the public-safety exception to the *Miranda* rule applies. Resp. at 17.

As established by the holding in *Miranda*, suspects must be advised of their constitutional rights before officers subject them to custodial interrogation. *United States v. Abdulla*, 294 F.3d 830, 834 (7th Cir. 2002) (citing *Miranda v. Arizona,* 384 U.S. 436, 444 (1955)). "Accordingly, a suspect must be both 'in custody' and subjected to 'interrogation' before the *Miranda* warnings requirement is triggered." *Id.* To be considered "in custody," a suspect's "movement [must be] restrained to the degree comparable to a formal arrest." *Id.* at 834. To determine whether an individual is in custody, courts are directed to consider whether, under the circumstances, "a reasonable person would have felt he or she was at liberty to terminate the interrogation and leave." *JDB v. North Carolina*, 564 U.S. 261, 270 (2011) (citing *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

The Supreme Court long ago held that a routine traffic stop does not place a suspect in custody for *Miranda* purposes. *Berkemer v. McCarty*, 468 U.S. 420, 437–40 (1984). This is because those stops are "presumptively temporary and brief," and because the circumstances of a "typical traffic stop are not such that the motorist feels completely at the mercy of the police." *Id.* at 437–38. But this does not mean that *Miranda* warnings are never required during a traffic stop: "if a motorist who has

been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." *Id.* at 440. In other words, a routine traffic stop by itself does not qualify as a custodial setting, but a traffic stop can *escalate* until the suspect is deemed to be in custody. It is not unusual, however, for a motorist to be asked to step out of her car, and this request alone does not place the motorist in custody. *See United States v. Johnson,* 680 F.3d 966, 975 (7th Cir. 2012) (overruled on other grounds by *Fowler v. Butts,* 829 F.3d 788 (7th Cir. 2016)).

With regard to interrogation, not every question from a law enforcement officer constitutes an interrogation for *Miranda* purposes. The Seventh Circuit directs courts to ask "whether a reasonable objective observer would have believed that the question claimed by the defendant to have been unlawful interrogation was in fact reasonably likely to elicit an incriminating response." *Abdulla*, 294 F.3d at 834 (cleaned up). Moreover, an officer's "reflexive question" responding to statements volunteered by a suspect without prompting "does not constitute an 'interrogation' for purposes of *Miranda*." *Anderson v. Thieret*, 903 F.2d 526, 531 (7th Cir. 1990).

With these principles in mind, it makes sense to divide Simpkins-McDonald's statements into two categories: those he made before he was handcuffed, and those he made after he was handcuffed.

**1. Before Handcuffs**

Simpkins-McDonald argues that he was "in custody" from the moment the officers "told him to sit down while they searched the car." Def's. Mot. at 11. The officers

first told him to sit at about 10:15 p.m. Brines Body Cam at 22:15. The government contends that Simpkins-McDonald was not in custody before he was handcuffed, citing *Berkemer* and *Maryland v. Shatzer*, 559 U.S. 98 (2010). Gov't. Resp. at 17 n.11. Although the government is ultimately correct, it is *not* because roadside questioning without handcuffs can *never* constitute custodial interrogation—as previously explained, the Supreme Court explicitly left open this possibility in *Berkemer*. Instead, under the specific circumstances of this case, Simpkins-McDonald was not in custody.

Although the traffic stop began in a routine way, it escalated at least twice before the officers handcuffed Simpkins-McDonald: once when they first told him to sit down, Brines Body Cam at 22:15, and again when they told him to sit and cross his ankles, Brines Body Cam at 22:19:27–29. After he was first told to sit, Simpkins-McDonald was able to stand again and walk over to the car. *Id.* at 22:17:10–25. A few minutes later, the officers directed him to sit again, and to cross his ankles, but even then, he still had access to his cell phone. *Id.* at 22:19:00–22:21:00. He was allowed and even encouraged to call his wife, who he had been told could come pick him up and pick up the car. Jimenez Body Cam at 22:12:50–22:14:00; Brines Body Cam at 22:19:00–22:21:00. And most importantly, both Jimenez and Brines told Simpkins-McDonald repeatedly that he was *not* under arrest and was *not* going to jail. Jimenez Body Cam at 22:13:35–55, 22:14:30–50, 22:15:20–45, 22:17:45–22:18:05; Brines Body Cam at 22:20:05–07.

Courts have declined to find that an individual was in custody under similar circumstances. In one case, the Seventh Circuit noted the following circumstances,

which largely apply to Simpkins-McDonald: "no weapons were drawn, Johnson was not told he was under arrest, Johnson was not handcuffed, only two plainclothes officers were present, the encounter occurred on a public roadway, and there was no other display of force or physical restraint." *Johnson*, 680 F.3d at 975. Although Simpkins-McDonald was *told* to sit, he was never physically forced down nor were weapons drawn while seated on the curb. Indeed, there is no allegation that the officers drew their weapons on Simpkins-McDonald at *any* point during the encounter, and the video footage does not show anything like that. With regard to the two additional officers, they did not arrive on the scene until *after* Simpkins-McDonald was cuffed. Brines Body Cam at 22:22:15–30. The encounter also occurred on a public roadway, a relatively busy and large street in Niles, where cars can be seen passing in the background. *See generally* Brines Body Cam. The similarities between this case and *Johnson* are compelling.

In another case, the Seventh Circuit again focused on the fact that the officer's weapon was not drawn, as well as the "calm voice" used by the officer and the public place of the encounter. *United States v. Schlatter*, 411 Fed.Appx. 896 (7th Cir. 2011) (nonprecedential disposition). Here too, Officers Jimenez and Brines sound calm throughout the body camera footage that the Court has reviewed. And, to repeat, the traffic stop took place on a busy street in public view.

In yet another case, even asking a motorist to sit *inside* an officer's patrol car was not enough to deem him to be in custody, because the district court did not find that it was "an otherwise coercive atmosphere." *United States v. Quinonez-Sandoval*,

943 F.2d 771, 775 (7th Cir. 1991); *see also United States v. Sullivan*, 138 F.3d 126, 132 (4th Cir. 1998) (holding that there was no custodial interrogation where the "conversation included no threats or statements that Sullivan was being detained, and it occurred at midday on the side of a highway in full public view"); *United States v. Brooks*, 772 Fed.Appx 573, 574 (9th Cir. 2019) (non-precedential disposition) (no custodial interrogation where defendant "was asked to sit in the patrol car while the trooper wrote the citation" but "he sat in the front seat and was not restrained"; he was also "repeatedly told he was not under arrest").

Ultimately, although the defense has a few points on its side, the Court concludes that, before he was handcuffed, Simpkins-McDonald was not in custody for *Miranda* purposes. Granted, he was firmly told to sit down, and he doubtless did not feel free to just get up and leave in that moment. But the Supreme Court acknowledged in *Berkemer* that "few motorists would feel free either to disobey a directive to pull over or to leave the scene of a traffic stop without being told they might do so." *Berkemer*, 468 U.S. at 436. Although this makes a traffic stop a seizure for *Fourth Amendment* purposes, it does not automatically elevate the stop to a custodial situation implicating the Fifth Amendment and *Miranda*. *Id.* at 436–40. Simpkins-McDonald was detained on the side of a public road, by two officers using a calm tone, who told him repeatedly he was not under arrest and allowed him to call his wife, who they said could come and literally pick him up. These are not arrest-like circumstances. The statements Simpkins-McDonald made under these circumstances are admissible.

### 2. After Handcuffs

Everyone agrees that Simpkins-McDonald was in custody for *Miranda* purposes after the officers handcuffed him. Def's. Mot. at 11; Resp. at 17. But the government argues that his statements while handcuffed should come in anyway, for two reasons. Neither is convincing.

First, the government argues that the public-safety exception to the *Miranda* rule applies. Resp. at 17–19. It is true that officers are permitted to ask any questions necessary to secure the officers' or the public's safety without administering *Miranda* warnings, so long as the officers are under time pressure. *New York v. Quarles*, 467 U.S. 649, 655–56 (1984); *United States v. Hernandez,* 751 F.3d 538 (7th Cir. 2014). But the public safety exception applies to *emergency* situations where there is a potential imminent risk to the public or the officers. That does not describe the situation in this case.

In the seminal public-safety exception case, police officers chased a suspect into a supermarket, following a tip from a woman who alleged the suspect had just raped her and was armed with a gun. *Quarles*, 467 U.S. at 651–52. An officer caught the suspect, frisked him, found an empty holster, handcuffed him, and asked where the gun was. *Id.* As soon as the officer recovered the gun from a nearby empty carton, the officer arrested the suspect and gave him the *Miranda* warnings. *Id.* In that case, the suspect was actively fleeing and almost surely (based on the victim's report and the empty holster) had discarded his gun in a public place where anyone could find it. That time-urgent situation is a far cry from the one facing Jimenez and Brines. They

had already determined that Simpkins-McDonald had no gun on his person by frisking him, Brines Body Cam at 22:01:30–22:02:04, and thus could only be concerned about a possible gun in the car, over which they already had control and which they were already searching. Jimenez Body Cam at 22:16:30–38.

The other cases cited by the government involve dramatic facts much closer to *Quarles*, and all far more extreme than this case. In *United States. v. Hernandez,* the defendant was seen picking up a bag in an alley, running away with it, and dropping it when he saw police officers. 751 F.3d 538, 539 (7th Cir. 2014). He told the officers, "I just have some dope," and handed over some heroin. *Id*. The Seventh Circuit determined the officers were justified in asking, without providing *Miranda* warnings, what was in the bag, because it could easily have been needles for the heroin or even a gun (given the connection to drug dealing), either of which posed a danger to the officers. *Id.* at 542–43. In *United States v. Khan*, an officer conducting a traffic stop saw a gun in the driver's side door, where the driver could reach it, and was justified in asking if the man had a gun. 937 F.3d 1042, 1054 (7th Cir. 2019). In *United States v. Mason*, an officer could see that the defendant was wearing an empty holster, and the officer had previously received a tip that the defendant had guns and drugs, so he was justified in asking about the gun. 737 Fed.Appx. 781, 783–84 (7th Cir. 2018) (non-precedential disposition). And in *United States v. Are*, local and federal law enforcement officers executed a search warrant to arrest a leader of the Four Corner Hustlers gang on drug trafficking charges. 590 F.3d 499, 506 (7th Cir. 2009). The officer knew that the gang leader had a history of gun charges, so they asked about

any guns in his home before reading him his rights. *Id*. The time urgency and the strength of the evidence that a gun was at hand render these cases different from Simpkins-McDonald's case.

The officers in this case were not faced with the kind of imminent threat to safety that justifies invoking the public-safety exception. They saw evidence of two nonviolent cannabis offenses. Resp. at 19. They patted down Simpkins-McDonald and found no weapons or holster. Brines Body Cam at 22:01:30–22:02:04. They believed that he was acting "nervous" and "agitated," and this made them "concerned about the presence of a weapon in the car." Resp. at 19. Having viewed the body camera footage, the Court agrees it is reasonable to characterize Simpkins-McDonald as increasingly nervous and agitated as the officers searched his car. But Simpkins-McDonald was unarmed (as confirmed by the pat-down), handcuffed (at this point), and sitting obediently on the curb as Brines asked him about the gun. Brines Body Cam at 22:21:05–24:00. Plus, the officers had complete control over the vehicle and were already searching it. *Id.* There were no passengers in it or nearby who might find the gun first. Although it is true that the officers were "considering driving defendant's car to a nearby parking lot or allowing defendant's wife to pick him up and drive him home," they were under no obligation to do either of these things, and his wife was not on the scene posing any kind of risk. Resp. at 19. There simply was no need to ask Simpkins-McDonald any questions about the contents of his car without first providing *Miranda* warnings.

The government offers a secondary argument against suppressing the statements that Simpkins-McDonald made while handcuffed: "that Officer Brines did not conduct an 'interrogation' under *Miranda*." Resp. at 19. The government asserts that Simpkins-McDonald simply volunteered incriminating statements, which would make those statements admissible. Resp. at 21; *Abdulla*, 294 F.3d at 836. The government further argues that to the extent Brines asked Simpkins-McDonald any questions, they were simply reflexive responses to statements Simpkins-McDonald made voluntarily, and therefore admissible. Resp. at 21. In the case cited for this proposition, a defendant was arrested for disorderly conduct after a domestic dispute and—with no prompting whatsoever—said in the squad car, "I stabbed her," referring to an unrelated murder he had recently committed. *Andersen v. Thieret,* 903 F.2nd 526, 528 (7th Cir. 1990). Confused, an officer asked, "Who?" and the defendant answered. *Id.* The Seventh Circuit explained that the answer was admissible "because Andersen volunteered his initial statement and the arresting officer's reflexive question does not constitute an 'interrogation' for purposes of *Miranda*." *Id.* at 531.

Here, a review of the body-camera footage reveals that Simpkins-McDonald did not simply "volunteer" information and that Brines did not simply ask "reflexive questions" in response. By the time that Simpkins-McDonald was handcuffed, he had already been asked repeatedly by both Brines and Jimenez what was in his car. Brines Body Cam 22:17:08–25, 22:17:30–34, 22:18:05–26, 22:20:05–07, 22:20:20–45. After he was handcuffed, Simpkins-McDonald remained sitting on the curb and he asked why the car was being searched. *Id.* 22:22:35–40. Brines explained the reason,

then asked once again what was in the car, telling Simpkins-McDonald to "be honest with me." *Id.* at 22:22:40–46. This was not a reflexive response to an out-of-the-blue statement. It was part of the officers' ongoing effort to make Simpkins-McDonald tell them what was in his car, which they had repeatedly tried to get out of him. Simpkins-McDonald had answered "just the weed" several times and ignored the question several other times. *Id.* at 22:18:00–26, 22:20:05–45. He was getting increasingly nervous. It is as obvious to this Court as it must have been to the officers that continued questioning about the contents of the car was "reasonably likely to elicit an incriminating response"—the exact definition of interrogation under *Miranda*. *Abdulla*, 294 F.3d at 834. And finally, seated in handcuffs on the curb past ten o'clock at night, with at least four officers on the scene, having been repeatedly asked about what was in his car, Simpkins-McDonald did offer an incriminating response, revealing that a gun was in the car and trying to explain how it got there. Brines Body Cam at 22:22:47–23:05. At this point, Simpkins-McDonald was in custody and was subject to an interrogation. He was entitled to receive *Miranda* warnings. The statements he made while handcuffed, before receiving *Miranda* warnings, must be suppressed.[5]

**3. After *Miranda* Warnings**

For completeness' sake, it is important to note that the statements Simpkins-McDonald made *after* he was given his *Miranda* warnings are admissible. The

[5]Suppressing these statements does not require suppressing the firearm. As discussed earlier in the Opinion, the officers had probable cause to search the car independent of Simpkins-McDonald's statements, and that search turned up the firearm.

government correctly argues that even when an initial statement must be excluded because of a *Miranda* violation, if it was not "obtained under coercive circumstances" it does not taint a subsequent, consistent statement given after a defendant receives his *Miranda* warnings. *Oregon v. Elstad*, 470 U.S. 298, 317–18 (1985). The defense has not offered any evidence that the officers in this case employed "inherently coercive police tactics or methods offensive to due process" that could have "undermine[d] [Simpkins-McDonald's] will to invoke his rights once they [were] read to him." *Id.* at 317. True, he should have been read his rights sooner and he was in custody. But the videos do not show a *coercive* setting, and the footage shows him receiving a *Miranda* warning and confirming that he understood it, before continuing to answer questions. Brines Body Cam at 22:30:32–31:08. The defense has not specifically explained why these statements should be excluded, and under *Elstad*, they are admissible.

## IV. Conclusion

For the reasons discussed, the government has shown that the firearm was lawfully recovered under the automobile exception to the Fourth Amendment. The government has also shown that the statements that Simpkins-McDonald made while he was detained by the side of the road, but not yet handcuffed, were not the subject of custodial interrogation. So those pre-cuffing statements are admissible. But the statements that Simpkins-McDonald made after being handcuffed, but before receiving *Miranda* warnings, must be suppressed because they were the result of an unwarned custodial interrogation.

The government and Simpkins-McDonald shall confer on the next step of the case (of course after defense counsel and Simpkins-McDonald themselves confer). The tracking status hearing of September 17, 2021, is reset to October 22, 2021, at 8:30 a.m., but to track the case only (no appearance is required). Instead, the parties shall file a joint status report on October 15, 2021.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: September 16, 2021